```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
                        WESTERN DIVISION
```

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.                           ) | 17-cr-20285-SHL-tmp |
| ) | |
| **MELVIN BULLOCK,** ) | |
| ) | |
| Defendant.                   ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is defendant Melvin Bullock's Motion to Suppress, filed on January 29, 2018. (ECF Nos. 33, 35.) The government filed a response on February 12, 2018. (ECF No. 40.) For the reasons below, it is recommended that Bullock's Motion to Suppress be denied.

### I.   PROPOSED FINDINGS OF FACT

At the suppression hearing, the court heard from one witness, Agent Andre Nash of the West Tennessee Drug Task Force, and received into evidence five exhibits, including the dashboard camera recording of the traffic stop at issue. The court finds Agent Nash's testimony to be credible.

On September 25, 2017, Agent Andre Nash was parked near Mile Marker 27 along Interstate 40 in Fayette County, Tennessee, conducting interstate interdiction. He did not have another law

enforcement officer with him, but was instead accompanied by "Nik," his certified narcotics detection canine. At approximately 10:10 a.m., Agent Nash observed a black 2014 Ford F-150 truck traveling eastbound on the interstate. As the Ford passed by, Agent Nash looked at the rear of the truck and saw that it did not have a license plate. Instead, it initially appeared to Agent Nash that there was some sort of a car dealership advertisement displayed inside the license plate holder. At approximately 10:12 a.m., Agent Nash pulled behind the Ford and initiated a traffic stop near Mile Marker 29. As Agent Nash pulled his vehicle closer to the rear of the truck, he saw that inside the license plate holder was a temporary drive-out tag. According to Exhibit 4, which shows a rear view of the Ford as it is parked next to a government vehicle, it appears the white temporary tag was approximately three inches high by seven inches wide, with small letters. Agent Nash could not read the expiration date or other information on the tag until he was standing a few feet away from the Ford.

For his own safety, Agent Nash approached the passenger's side of the truck to ask the driver to exit. In addition to the male driver, there was a male passenger in the front seat and a female passenger in the back seat. Because Agent Nash was by himself, he instructed the driver, later identified as Melvin Bullock, to step out of the truck and to meet him in front of

the police vehicle with his driver's license, proof of insurance, and registration. Bullock complied with these instructions. Agent Nash proceeded to ask Bullock about the temporary tag. Bullock said that he got the tag in Atlanta where he had purchased the vehicle the day before. When asked by Agent Nash where he was bringing the vehicle, Bullock stated that he was bringing the vehicle to Tennessee and that he lived in Knoxville. Agent Nash explained to Bullock that he pulled him over because he could not read the temporary tag and it looked like the truck did not have a license plate.

At approximately 10:14 a.m., Agent Nash started to look through the documents Bullock had handed him. The registration information indicated the vehicle had been bought on September 5, 2017, by someone named Tellerick Lejewell Simon. Agent Nash asked Bullock where he was headed, and Bullock stated he was going to Knoxville. Agent Nash confirmed with Bullock that he had provided all of the registration information provided by the seller of the truck, that Bullock lived in Knoxville, and that the truck belonged to him.

Approximately three minutes after pulling the truck over, at 10:15 a.m., Agent Nash again approached the truck, this time to speak with the passengers. His reasons for doing this were twofold. Primarily, he approached for safety reasons — in order to ensure the passengers were calm and to make sure they did not

have a weapon. Secondarily, he approached to investigate the inconsistencies between the registration and Bullock's statements. Agent Nash explained to the passengers why he stopped them. He asked the front seat passenger whether the truck belonged to him, and the man replied that it did and he had bought it three weeks earlier. The passengers then gave Agent Nash their driver's licenses. The front seat passenger's license indicated he was Anthony Duane Simon. The back seat passenger's license indicated she was Kayla Palmer. Answering further questions from Agent Nash, Simon explained that they were traveling to Knoxville from Dallas.

Agent Nash then went to his vehicle, pausing before entering it to ask Bullock where they were traveling from. Bullock responded they were coming back from a family reunion. At 10:18 a.m., Agent Nash called the Blue Lightning Operations Center ("BLOC") to run a check on the driver's licenses for all three occupants. While waiting for the results, Agent Nash approached Bullock and told him that he was going to ask him some questions, but that Bullock did not have to answer any of them. Agent Nash then asked Bullock whether he had any illegal substances, large amounts of money, or weapons in the truck. Bullock said he did not and agreed to take full responsibility for the contents of the truck. Agent Nash asked for consent to search the truck, but Bullock refused to give consent. Agent

-4-

Nash then told Bullock that he would run his canine around the truck. Agent Nash instructed the two passengers to exit the truck, and they complied. When exiting the truck, Palmer left the back seat door open.

At 10:25 a.m., while still waiting on the results of the license check, Agent Nash deployed his canine. The canine ran immediately to the open door and lunged into the back seat area of the truck, indicating the presence of the odor of narcotics. Agent Nash pulled the canine out of the back seat and walked him around the truck. Nik again lunged into the back seat of the truck. At this point, other law enforcement agents arrived on the scene and assisted Agent Nash with placing all three occupants in squad cars and searching the truck. In a backpack and a shopping bag located in the back seat, the agents found twenty packages of cocaine, weighing a total of approximately fifty pounds. Bullock was later indicted for conspiracy to possess a controlled substance with intent to distribute in violation of 21 U.S.C. § 846 and possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

## II. PROPOSED CONCLUSIONS OF LAW

A.  **Proper Basis for Initiating Traffic Stop**

The Fourth Amendment provides, in part, that "[t]he right of the people to be secure in their persons, houses, papers, and

-5-

effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. This protection from unreasonable search and seizure "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Johnson, 702 F. App'x 349, 355 (6th Cir. 2017). The constitutionality of such a stop is evaluated by a two-step analysis: first, there must be a proper basis for the stop; second, the degree of intrusion must be reasonably related in scope to the situation at hand. United States v. Davis, 514 F.3d 596, 608 (6th Cir. 2008).

Agent Nash initiated the traffic stop because the Ford truck had an improperly displayed license plate, in violation of Tennessee Code Annotated § 55-4-110. Section 55-4-110 requires the following:

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches (12") from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible . . . .

These requirements apply to permanent and temporary license plates on vehicles that travel in Tennessee, regardless of whether the plate was issued in Tennessee or another state. United States v. Simpson, 520 F.3d 531, 535-38, 541-42 (6th Cir.

2008) (holding that Tennessee law governed the display of defendant's Ohio-issued temporary license plate while he traveled in Tennessee). Because a violation of T.C.A. § 55-4-110 is considered an "ongoing" criminal offense, an officer need only possess reasonable suspicion (as opposed to probable cause) that a vehicle's license plate violates the statute in order to justify an investigatory stop under the Fourth Amendment.[1] Id. at 542 ("[T]he proper question is not whether [defendant] was, in fact, violating § 55-4-110(b) by having an illegible expiration date on his temporary tag. The question is whether [the officer] had an objectively reasonable suspicion that a violation of that statute was occurring."). Here, the court finds that Agent Nash had reasonable suspicion that the Ford truck was violating § 55-4-110, and thus he was justified in initiating the traffic stop. From the position where Agent Nash was following the truck, he could not make out the writing on the temporary tag, which is corroborated by the dashboard camera video and the photograph of the truck. It was only after the Ford stopped and Agent Nash pulled his vehicle up close to the truck that he could see that what he initially thought was a

---

[1] Bullock argues that Agent Nash, upon discovering that the advertisement was actually a temporary tag, should have terminated the stop. This argument is without merit. Bullock was stopped for having an improperly displayed license plate, which was not cured by the fact that the truck had a license plate.

dealership advertisement was a temporary tag. Agent Nash could not read the expiration date or other information on the tag until he was standing a few feet away from the Ford. See id. at 542 ("Although we are aware of no Tennessee case law that indicates a precise distance from which a temporary tag's expiration date must be visible, it seems reasonable to assume that more than a few feet is required."); United States v. Melton, No. 1:17-CR-69, 2017 WL 6343794, at *1, *5 (E.D. Tenn. Dec. 12, 2017) (finding that an officer had reasonable suspicion to stop the defendant when "he was unable to read the car's temporary tag from a distance of one to one-and-a-half car-lengths away from the car" and officer "could not read the tag's information until he exited his patrol car and was standing a few feet away from the Mercedes"); see also State v. Ochoa, No. M2011-02400-CCA-R3CD, 2012 WL 6082476, at *8 (Tenn. Crim. App. Dec. 7, 2012) (finding that officer had reasonable suspicion to stop the defendant when "he was unable to read the issuing state or expiration date on the defendant's temporary tag while traveling at a distance of five or six car lengths behind the defendant's vehicle" due to a plastic cover over the tag); State v. Matthews, No. M200100754CCAR3CD, 2002 WL 31014842, at *1–3 (Tenn. Crim. App. Sept. 10, 2002) (finding that officer had reasonable suspicion to stop the defendant when "he was unable to see if in fact the car had a license plate").

**B.     Reasonableness of the Degree of Intrusion**

Once the stop was initiated, Agent Nash's "mission include[d] 'ordinary inquiries incident to [the traffic] stop'" such as "checking the driver's license, determining whether there [were] outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 408, (2005); citing Delaware v. Prouse, 440 U.S. 648, 658–660 (1979)). Law enforcement may ask questions reasonably related to "dispel[ling] the suspicion that warranted the stop." Houston v. Clark Cnty. Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1999). Law enforcement may also ask questions "unrelated to the justification for the traffic stop . . . so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009). The Sixth Circuit has explained that officers can ask questions unrelated to the scope of the investigation as long as the officers only "minimally prolong a traffic stop," are not overly coercive, and the "overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." United States v. Everett, 601 F.3d 484, 492, 495–97 (6th Cir. 2010). "[A]n officer may ask unrelated questions to his heart's content,

-9-

provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation." Everett, 601 F.3d at 492; see also United States v. Collazo, 818 F.3d 247, 258 (6th Cir. 2016) (noting that it was reasonable for a law enforcement agent to ask a person unrelated questions while waiting for the results of a license check); United States v. Lyons, 687 F.3d 754, 770 (6th Cir. 2012) ("Questions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer are the sorts of classic context-framing questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence.") (internal brackets, citation, and quotation marks omitted).

Agent Nash's questions posed to Bullock and the other two occupants of the truck were permissible because they were related to the truck's registration or were context-framing. None of them extended the traffic stop beyond a reasonable time. See Rodriguez, 135 S. Ct. at 1615; Collazo, 818 F.3d at 257-58. Therefore, the court finds that the questions Agent Nash asked did not extend the scope or duration of the stop.

Finally, "the use of dogs during routine traffic stops does not infringe on one's constitutionally protected privacy interests." United States v. Campbell, 511 F. App'x 424, 427 (6th Cir. 2013) (citing Illinois v. Caballes, 543 U.S. 405, 409

(2005)). Because Agent Nash deployed his canine during "dead time" while waiting for the results of the driver's license check to come back – a check that Agent Nash regularly performs during traffic stops - the use of the canine did not violate Bullock's Fourth Amendment rights. Nor has Bullock presented any evidence suggesting that the traffic stop was prolonged in order to use the canine. See Campbell, 511 F. App'x at 427. Moreover, although Nik lunged into the back seat area of the truck, it was one of the passengers who left the door open (not Agent Nash) and there is no evidence that Nik's entry into the truck was in any way encouraged or facilitated by Agent Nash. See United States v. Sharp, 689 F.3d 616, 620 (6th Cir. 2012). Nik's positive alert thereafter provided the agents with probable cause to search the vehicle for drugs. United States v. Diaz, 25 F.3d 392, 393-94 (6th Cir. 1994).

### III. RECOMMENDATION

For the above reasons, it is recommended that Bullock's Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

May 18, 2018
Date

**NOTICE**

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**