# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17-cr-20285-SHL-tmp |
| ) | |
| MELVIN BULLOCK, ) | |
| ) | |
| Defendant. ) | |

## ORDER ADOPTING THE REPORT AND RECOMMENDATION AND DENYING DEFENDANT BULLOCK'S MOTION TO SUPPRESS

Before the Court is Defendant Melvin Bullock's Motion to Suppress, filed January 29, 2018. (ECF No. 33.) The Court referred the Motion to Magistrate Judge Pham for Report and Recommendation on January 30, 2018. (ECF No. 35.) The Government filed its Response in Opposition on February 12, 2018. (ECF No. 40.) Magistrate Judge Pham held an evidentiary hearing on March 5, 2018. (ECF No. 61.)

On May 18, 2018, Magistrate Judge Pham issued a Report and Recommendation (the "Report"), recommending that the Motion be denied. (ECF No. 98.) After being granted an extension of time, Mr. Bullock filed objections to the Report on June 11, 2018, arguing that Magistrate Judge Pham made errors in both his findings of fact and his conclusions of law. (ECF No. 101.) Thereafter, the Government filed a Response to Defendant's Objections on June 25, 2018. (ECF No. 110.) As is more fully articulated herein, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation and **DENIES** Mr. Bullock's Motion to Suppress Evidence.

**FACTS**

On October 24, 2017, Mr. Bullock was indicted for possession with intent to distribute cocaine and conspiracy to distribute cocaine. (ECF No. 17.)[1] At the evidentiary hearing on this Motion, the Government called Agent Andre Nash with the West Tennessee Drug Task Force as a witness and entered five exhibits into evidence. Mr. Bullock objects to only one factual finding. As such, the Court adopts all but that one factual finding included in the Report. (ECF No. 98.)[2]

On September 25, 2017, Agent Nash was on duty parked along Interstate 40. He was accompanied by "Nik," his certified narcotics detection canine. At around 10:10 a.m., Agent Nash saw a truck driving with what appeared to him to be a car dealership advertisement inside the license plate holder. Around two minutes later, Agent Nash initiated a traffic stop. As he approached the truck, he saw that a temporary drive-out tag was displayed in the license plate holder. A photograph of the tag showed that it was approximately three inches high by seven inches wide, with small letters. Agent Nash could not read the expiration date or any other information on the tag until he was a few feet away from the truck.

Agent Nash asked the driver, who was later identified as the Defendant, Melvin Bullock, to exit the vehicle and meet him in front of his police cruiser with his driver's license, proof of insurance and registration. Mr. Bullock complied. Agent Nash then asked Mr. Bullock about the temporary tag. Mr. Bullock said that "he got the tag in Atlanta where he had purchased the vehicle the day before . . . that he was bringing the vehicle to Tennessee and that he lived in

---

[1] Subsequent superseding indictments (ECF Nos. 44, 65) only added co-defendants.

[2] Mr. Bullock objects to Magistrate Judge Pham's factual finding that Mr. Bullock agreed to take responsibility for any items in the truck. (ECF No. 101 at 1.) Because this finding is ultimately irrelevant to the Court's ruling on the Motion to Suppress, the Court will disregard it.

Knoxville." (Id. at 3.) Agent Nash explained that he pulled Mr. Bullock over "because he could not read the temporary tag and it looked like the truck did not have a license plate." (Id.)

Approximately two minutes later, Agent Nash looked through the documents Mr. Bullock gave him. The registration showed that—contrary to what Mr. Bullock said—the vehicle was purchased almost three weeks prior by someone named Tellerick Lejewell Simon. After confirming Mr. Bullock's version of events with him, Agent Nash decided to speak with the two passengers in the vehicle. He explained why he had stopped them, and asked the front seat passenger whether the truck belonged to him. The man, whose driver's license indicated that he was Anthony Duane Simon, replied that it did and said that he had purchased it three weeks earlier. He also explained that they were traveling from Dallas.

A few minutes later, "Agent Nash called the Blue Lightning Operations Center ("BLOC") to run a check on the driver's licenses for all three occupants." (Id. at 4.)[3] While waiting for the results, Agent Nash asked for consent to search the truck. Mr. Bullock declined. Agent Nash then told Mr. Bullock that he would run his canine around the truck. Nik alerted to the truck twice, at which point other officers arrived and assisted Agent Nash in detaining Mr. Bullock and his passengers. A subsequent search of the truck revealed twenty packages of cocaine, weighing approximately fifty pounds, in a backpack and a shopping bag in the back seat.

## **ANALYSIS**

A magistrate judge may submit to a judge of the court proposed findings of fact and recommendations for certain pretrial matters. 28 U.S.C. § 636(b)(1)(B). "Within 14 days after

---

[3] Later in his Report, Magistrate Judge Pham notes that "Agent Nash regularly performs [this check] during traffic stops." (Id. at 11.)

3

being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1). A district court reviews de novo only those proposed findings of fact or conclusions of law to which a party specifically objects. Fed. R. Crim. P. 59(b)(3); 28 U.S.C. § 636(b)(1). After reviewing the evidence, the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Mr. Bullock raised two objections to the Report that require ruling. First, Mr. Bullock objects to Magistrate Judge Pham's legal conclusion that Agent Nash had reasonable suspicion to initiate the stop. (ECF No. 101 at 1.) Second, Mr. Bullock objects to Magistrate Judge Pham's legal conclusion that the degree of intrusion was reasonable under the circumstances. (Id. at 2.) The Court addresses Mr. Bullock's objections in turn.

**I.      Reasonable Suspicion**

Mr. Bullock first argues that the stop of the vehicle was improper because Agent Nash never suspected a violation of Tennessee Code Annotated § 55-4-110(b) (the traffic law at issue here). Indeed, according to Mr. Bullock, the evidence demonstrated that the tag was displayed in conformity with the law.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection "extend[s] to brief investigatory stops of persons or vehicles." United States v. Arvizu, 534 U.S. 266, 273 (2002). Such stops are constitutionally valid only where there is "a proper basis for the stop" and where the degree of intrusion is "reasonably related in scope to the situation at hand." United States v. Davis, 514 F.3d 596, 608 (6th Cir. 2008). A "proper basis" for a stop exists when law enforcement officials are "aware of specific

and articulable facts which gave rise to reasonable suspicion" that the law was being violated. Id.[4]

Mr. Bullock was "stopped for having an improperly displayed license plate." (ECF No. 98 at 7.) The relevant section of the Tennessee Code reads:

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches (12") from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible . . . . No tinted materials may be placed over a license plate even if the information upon the license plate is not concealed.

Tenn. Code Ann. § 55-4-110(b).[5] Mr. Bullock argues that he was not violating the law, because "there is no clear cut requirement of legibility in the statute," relying on State v. Hall, No. E2006-01915-CCA-R3-CD, 2007 WL 2917728 (Tenn. Crim. App. Oct. 5, 2007) (holding that officer's "subjective judgment that the license plate was 'hard to see' cannot be construed as a 'particularized and objective basis' for suspecting that the defendant was in violation of a traffic offense").

Mr. Bullock's legal argument is misplaced. The Sixth Circuit has interpreted the Tennessee statute as imposing "the obligation to have 'visible' and 'legible' plates," even in light of Hall. Simpson, 520 F.3d at 536, 542, 544. See also State v. Matthews, No. M2001-00754-CCA-R3-CD, 2002 WL 31014842, *3 (Tenn. Crim. App. Sept. 10, 2002) ("[T]he legislature intended . . . that vehicle license plates be clearly visible at all

---

[4] In some situations, an officer must have "probable cause to believe that a traffic violation has occurred." United States v. Simpson, 520 F.3d 531, 539 (6th Cir. 2008) (emphasis in original). However, because a violation of Tennessee Code Annotated § 55-4-110(b), the statute at issue here, is "ongoing," only reasonable suspicion is required to support an investigatory stop. Id. at 541.

[5] This statute is applicable to temporary tags, even those issued in other states, while they are present in Tennessee. Simpson, 520 F.3d at 534, 541.

5

times."). And, based on this law, Magistrate Judge Pham found that Agent Nash did have reasonable suspicion that the vehicle's plates were displayed in violation of Tennessee law because he "could not make out the writing on the temporary tag" while following the vehicle. (ECF No. 98 at 7.) The "dashboard camera video and [a] photograph of the truck" corroborated Agent Nash's perspective. (Id.) Because Agent Nash could not discern the writing on the tag until he "pulled his vehicle up close to the truck," Judge Pham concluded that the tag was improperly displayed and that Agent Nash therefore had reasonable suspicion to stop the vehicle. (Id.)

Given the Sixth Circuit's interpretation of § 55-4-110, the Court agrees with Magistrate Judge Pham's conclusion. Under Tennessee law, Mr. Bullock was obligated to ensure that the temporary drive-out tag on his vehicle was visible and legible. In addition, "the proper question is not whether [Mr. Bullock] was, in fact, violating § 55-4-110(b) by having an illegible . . . temporary tag. The question is whether [Agent Nash] had reasonable suspicion that a violation of that statute was occurring." See Simpson, 520 F.3d at 542. Even if § 55-4-110(b) did not impose a legibility requirement, "the inability of the officer to perceive the expiration date while driving at very close proximity gave him at least reasonable suspicion to believe that the statute was being violated." Id.

Therefore, Mr. Bullock's objection that there was no reasonable basis to initiate the investigatory stop is **OVERRULED**.

II. **Degree of the Intrusion**

Mr. Bullock also challenges the degree of the intrusion. (ECF No. 101 at 2.) Specifically, Mr. Bullock argues that, "upon exiting his vehicle, the officer confirmed that the tag

6

was properly displayed." (ECF No. 101 at 2.) According to Mr. Bullock, the stop was unreasonably prolonged after that point—including by the use of the drug dog—given that the suspicion that warranted the stop was answered. (Id. at 2–4.)

> The degree of intrusion permitted during an investigative stop
>
> "will vary with the particular facts and circumstances of each case," but in all cases the "detention must be temporary and last no longer than is necessary" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."

Bennett v. City of Eastpointe, 410 F.3d 810, 836 (6th Cir. 2005) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). In other words, the stop "must not only be justified at its inception, but also must be reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Campbell, 549 F.3d 364, 372 (6th Cir. 2008) (internal quotation marks omitted). "The propriety of the intrusion is judged by examining the reasonableness of the officers' conduct in light of the surrounding circumstances and their suspicions." Id.

But an officer's activities are not strictly limited to those related to the initial suspicion. Even if Agent Nash concluded that there was no violation of the law once he was able to read the tag,[6] he was permitted to approach the vehicle "to explain the reason for the stop." Simpson, 520 F.3d at 543. And, once a stop is initiated, "an officer's mission [also] includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015) (internal alterations, quotation marks, and citation omitted). An officer may ask questions that are

---

[6] Mr. Bullock asserts that "[t]he officer at the hearing admitted that the tag was displayed in conformity with TCA Section 55-4-110(b)." (ECF No. 101 at 2.)

7

reasonably related to dispelling the suspicion that warranted the stop, see Houston v. Clark Cty. Sheriff Deputy John Does 1–5, 174 F.3d 809, 815 (6th Cir. 1999), and may also ask questions "unrelated to the justification for the traffic stop . . . so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009). "[A]n officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he . . . is completing a task related to the traffic violation." United States v. Everett, 601 F.3d 484, 492 (6th Cir. 2010).

Magistrate Judge Pham found that the degree of intrusion was not unreasonable, and the Court agrees with his conclusion. Agent Nash initiated the stop because he had reasonable suspicion that the driver's temporary tag was displayed in violation of Tennessee law. Upon approaching the car, Agent Nash asked "ordinary inquiries incident to the traffic stop" and ran a driver's license check. In addition, the inconsistencies between the Mr. Bullock's answers, those of his passengers and the registration information provided further reasonable suspicion that illegal activity was afoot. Compare Simpson, 520 F.3d at 543. As Magistrate Judge Pham found, "[b]ecause Agent Nash deployed his canine during 'dead time' while waiting for the driver's license check to come back . . . the use of the canine did not violate [Mr. Bullock]'s Fourth Amendment rights." (ECF No. 98 at 11.) Accordingly, Mr. Bullock's objection is **OVERRULED**.

## CONCLUSION

Based on the foregoing, the Court **OVERRULES** Mr. Bullock's Objections to the Report. As to the portions of the Report not objected to, the Court finds no clear error. Therefore, the Court Adopts the Report, and Mr. Bullock's Motion to Suppress Evidence is **DENIED**.

**IT IS SO ORDERED,** this 19th day of July, 2018.

                                              s/ Sheryl H. Lipman
                                              SHERYL H. LIPMAN
                                              UNITED STATES DISTRICT JUDGE